**[J-30-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| MARIE SCOTT, NORMITA JACKSON, MARSHA SCAGGS, REID EVANS, WYATT EVANS, TYREEM RIVERS | : | No. 16 WAP 2021 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court entered May 28, 2021 at No. 397 MD 2020. |
| v. | : | |
| | : | ARGUED: April 13, 2022 |
| | : | |
| PENNSYLVANIA BOARD OF PROBATION AND PAROLE | : | |
| | : | |
| APPEAL OF: MARIE SCOTT, NORMITA JACKSON, MARSHA SCAGGS, TYREEM RIVERS | : | |

**OPINION**

**JUSTICE DONOHUE**                                       **DECIDED: OCTOBER 19, 2022**

The four named appellants were convicted of what is today codified as second-degree murder[1] and as a result are ineligible for parole per 61 Pa.C.S. § 6137(a)(1). ("The board may parole … any offender to whom the power to parole is granted to the board by this chapter, except an offender condemned to death or serving life imprisonment.").

---

[1] 18 Pa.C.S. § 2502(b) (murder of the second degree); 18 Pa.C.S. § 1102(b) (setting penalty for murder of the second degree as a term of life imprisonment). Appellant Marie Scott was charged in 1973, before the crime exists as it does today. *See Commonwealth v. Moore*, 373 A.2d 1101, 1103 n.4 (Pa. 1977) (stating that as of 1974 "murder of the second degree has been reclassified as murder of the third degree and felony murder has been reclassified as murder of the second degree").

Appellants filed a petition for review in the nature of a complaint in the Commonwealth Court, seeking a declaration that Section 6137(a)(1)[2] is unconstitutional as applied on the grounds that depriving Appellants of any opportunity for parole violates the constitutions of this Commonwealth and the United States. We granted review to determine whether this suit was within the Commonwealth Court's original jurisdiction to hear suits against government agencies like the Board of Probation and Parole ("Board")[3] or whether the petition fell within the statutory exception for petitions in the nature of post-conviction relief. We affirm the Commonwealth Court's holding that it lacked jurisdiction. While some claims challenging parole eligibility may be heard in the Commonwealth Court, these claims, which require the declaration of a new constitutional holding that life sentences without the possibility of parole ("LWOP") sentences are unconstitutional, are encompassed by the statutory exception for petitions in the nature of post-conviction relief. We therefore affirm.

## I.

### Procedural Background

On May 19, 2020, each appellant submitted an application for parole to the Board.[4] Petition for Review, 7/8/2020, at 9-10, ¶ 19. The Board denied each application on the

---

[2] As the Commonwealth Court pointed out in its opinion, while Appellants generically referenced Section 6137 their challenge is to Section 6137(a)(1). We thus refer to that subsection. *Scott v. Pa. Bd. of Prob. & Parole*, 256 A.3d 483, 485 n.3. (Pa. Commw. 2021).

[3] 42 Pa.C.S. § 761.

[4] The facts specific to each of the four underlying convictions for second degree murder are irrelevant to our analysis and we omit these details. The Commonwealth Court opinion, authored by then-President Judge and now-Justice Brobson, cogently sets forth the facts and rehabilitative efforts of the respective appellants.

basis that serving a sentence of life imprisonment rendered each ineligible for parole per Section 6137. *Id.* at 10, ¶ 20. On July 8, 2020, counsel filed a petition for review in the Commonwealth Court's original jurisdiction, seeking a declaration that Section 6137(a)(1) was unconstitutional as applied. The petition raised two claims for relief. First, that the Board's enforcement of the statute "violates Art. I, § 13 of the Pennsylvania state constitution prohibiting 'cruel punishments.'" *Id.* at 36, ¶ 133. With respect to this count, Appellants argued that the analysis would be the same as under the Eighth Amendment to the United States Constitution because the Pennsylvania Constitution must offer at least as much protection. The second claim argued that if the first claim were rejected the statute is unconstitutional under the heightened protections of the Pennsylvania Constitution. *Id.* at 38, ¶ 141 (citing *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991)).

The Board, represented by the Attorney General, filed preliminary objections, which included a "lack of jurisdiction / improper venue." While 42 Pa.C.S. § 761(a)(1) authorizes suits "[a]gainst the Commonwealth government," the Board pointed to the statutory exception for "actions or proceedings in the nature of applications for a writ of habeas corpus or post-conviction relief not ancillary to proceedings within the appellate jurisdiction of the court." 42 Pa.C.S. § 761(a)(1)(i). According to the Board, the claims raised fit within this statutory exception. Preliminary Objections, 8/7/2020, at unnumbered ¶ 11.

Appellants replied to the objections, arguing, in pertinent part, that the Commonwealth Court had original jurisdiction over the matter because they were not challenging their sentence of life imprisonment. Their fundamental position was that the

trial court imposed the sentence of life imprisonment but did not impose a sentence of life without parole. The inability to receive parole is a result of multiple statutory provisions, "but it is not part of the sentence per se." Answer to Preliminary Objection, 9/8/2020, at 3, ¶ 2. Thus, the sought relief did not implicate their criminal sentences but merely "parole eligibility, which may or may not result in release, and … does not challenge Petitioners' underlying convictions or sentences[.]" *Id.* at 8, ¶ 16 (emphasis omitted).

The Commonwealth Court sustained the jurisdictional preliminary objection and dismissed the petition. *Scott v. Pa. Bd. of Prob. & Parole*, 256 A.3d 483, 485 (Pa. Commw. 2021). The panel drew guidance from *Stackhouse v. Commonwealth*, 832 A.2d 1004 (Pa. 2003) (plurality), which addressed whether the Commonwealth Court had jurisdiction over a three-count complaint filed by Diane Stackhouse, a Pennsylvania State Police employee. The allegations concerned Stackhouse's application for a job promotion, which entailed an internal investigation. Stackhouse alleged that certain PSP employees were permitted to improperly probe her private affairs. Stackhouse named as defendants the PSP, the PSP Commissioner, and Deputy Commissioner Paul Evanko. The first count of the complaint sought a declaration that Stackhouse's privacy and reputational interests were harmed during the investigation. The second and third counts sought monetary damages from Commissioner Evanko.

Stackhouse filed her suit in the court of common pleas. The defendants filed preliminary objections asserting that the Commonwealth Court had original jurisdiction, because the complaint was against the PSP as an agency and its officials. The trial court granted the jurisdictional objection and transferred the action to the Commonwealth Court, which in turn determined that the actions were essentially tort actions. Those

actions are specifically excluded from its original jurisdiction. *See* 42 Pa.C.S. § 761(a)(1)(v) (generally excluding actions against government officials "in the nature of trespass"). It therefore dismissed the petition for lack of original jurisdiction.

We affirmed, with no majority opinion. The primary difficulty was that all parties agreed that the first count was within the Commonwealth Court's original jurisdiction, but the remaining two were excluded because they were essentially tort actions. The Commonwealth argued that the Commonwealth Court had ancillary jurisdiction over counts two and three per 42 Pa.C.S. § 761(c) ("To the extent prescribed by general rule the Commonwealth Court shall have ancillary jurisdiction over any claim or other matter which is related to a claim or other matter otherwise within its exclusive original jurisdiction."). Stackhouse, meanwhile, agreed that only count one was within the Commonwealth Court's original jurisdiction but "for the sake of judicial economy" asked that the matter be remanded to the county court of common pleas. *Stackhouse*, 832 A.2d at 1007.

A three-Justice plurality resolved the issue by recharacterizing count one, concluding that it "rests upon the same allegations of defamation and invasion of privacy as asserted in Counts II and III." *Id*. at 1008. Including a count for declaratory or injunctive relief cannot "transform the complaint" from a trespass action into an action belonging within the Commonwealth Court's original jurisdiction. *Id*. Because "the core of [Stackhouse's] complaint is an action in trespass, original jurisdiction lies in the court of common pleas notwithstanding the injunctive/declaratory label attached to Count I." *Id*. at 1009. The plurality remarked that "permitting jurisdictional questions to turn solely upon

the styling of claims within a complaint would arguably permit forum shopping through pleading." *Id.* at 1008 (citation omitted).

Following that rationale, the Commonwealth Court concluded that the two claims presented "squarely challenge the constitutionality of Petitioners' sentences." *Scott*, 256 A.3d at 491. The panel observed that the Appellants heavily relied on precedents like *Miller v. Alabama*, 567 U.S. 460 (2012) (holding that Eighth Amendment prohibits sentencing individuals who commit crimes as juveniles to mandatory sentence of life imprisonment without parole) to support their petition for review. While the Appellants styled these claims in the context of seeking declaratory relief from a Commonwealth agency, that characterization did not control per the *Stackhouse* analysis. The Appellants "have fashioned the Petition in this manner in a thinly veiled attempt to forum shop through pleading[.]" *Id.* at 492. The court concluded that the statutory exception applied and dismissed the petition.

Senior Judge Bonnie Brigance Leadbetter dissented. Judge Leadbetter did not "read the Complaint in this case as an attack on Petitioners' convictions or sentences, but rather as what it purports to be: a facial and as applied Eighth Amendment challenge to the provisions of the Prisons and Parole Code[.]" *Id.* at 496 (Leadbetter, J., dissenting). Judge Leadbetter observed that the claims "plainly cannot be raised in petitions filed pursuant to the Post Conviction Relief Act because such petitions have been time-barred for many years and when they were timely, the pled circumstances which now give rise to potential Eighth Amendment claims did not exist." *Id.* (footnote omitted).

Appellants filed a direct appeal to this Court as of right. 42 Pa.C.S. § 723(a).

**II.**

**Arguments**

The Appellants reiterate their fundamental argument that their petition does not attack their sentences or convictions and merely challenges the Board's decision not to process their applications for parole. For over a century this Court has recognized the principle that "the maximum sentence imposed by the trial court is the 'true sentence' and the only sentence with 'legal validity,' and that parole is merely a condition on that sentence." Appellants' Brief at 20.

Appellants discuss our recent decision in *Hudson v. Pennsylvania Board of Probation & Parole*, 204 A.3d 392 (Pa. 2019), which in their view corroborates the foregoing distinction between challenges to parole eligibility that belong in the Commonwealth Court and claims concerning the sentence itself, and definitively establishes that the Commonwealth Court erred by finding a lack of jurisdiction. In *Hudson*, an inmate serving a sentence of life imprisonment for second degree murder sought parole, which the Board denied on the basis that an inmate is eligible for parole only upon completing the minimum sentence; a sentence of life imprisonment has no minimum sentence and thus is ineligible for parole. Hudson thereafter filed a petition for review in the Commonwealth Court, alleging that "because the common pleas court had failed to specify a minimum sentence, he should be deemed to have an implied minimum of one day of confinement." *Id.* at 394.

As discussed in more detail later, the *Hudson* Court determined that the minimum sentence "merely sets the time after which he is eligible to serve the remainder of his sentence on parole." *Id.* at 396. We rejected the notion that trial courts must set a minimum sentence when imposing a life sentence, as that is logically impossible without knowing when a person will die. We also rejected the argument that a minimum sentence should be presumed. We ultimately concluded that "the Board lacks the power to release on parole an inmate servicing [sic] a mandatory life sentence for second-degree murder." *Id.* at 399.

According to Appellants, *Hudson* supports a finding of jurisdiction because we stated that "the actual sentence of a prisoner subject to total confinement is his maximum sentence." *Id.* A decision in their favor means only that they will be eligible for parole, and even if paroled "their maximum sentence of life – the 'real' and 'only' sentence they are serving – will remain intact." Appellants' Brief at 23.

Appellants argue that nothing in *Hudson* suggested that the Commonwealth Court lacked jurisdiction to entertain the claim, as this Court is free to address subject-matter jurisdiction sua sponte. It thus follows that we implicitly accepted the Commonwealth Court's original jurisdiction. Appellants submit that it is unlikely the *Hudson* Court overlooked an obvious jurisdictional issue, and the case should therefore be read to hold that the Commonwealth Court has original jurisdiction to entertain claims concerning parole eligibility.

Appellants finally urge this Court to consider federal decisions examining claims brought under 42 U.S.C. § 1983, which provides civil remedies for violations of constitutional rights. Appellants cite *Hill v. Snyder*, 878 F.3d 193 (6th Cir. 2017), which

involved a suit commenced in 2010 by several Michigan individuals serving sentences of life imprisonment without parole for crimes committed as juveniles. During the pendency of that litigation, the United States Supreme Court decided *Miller* and Michigan officials made legislative changes in response. Appellants quote the portion of *Hill* declaring that the claims could proceed under Section 1983 because "success would not automatically result in speedier release … [b]ecause the Michigan Parole Board retains discretion to deny parole to those who are or become eligible[.]" *Id*. at 211. Thus, success on the merits "would not automatically spell speedier release" and the suits could proceed under Section 1983. Appellants maintain that we should adopt this same logic.

The Commonwealth challenges the Appellants' fundamental premise that parole consideration exists separately from the criminal sentence. "This is artifice intended to circumvent the clear limitations on Commonwealth Court jurisdiction, and obtain a second, illicit bite at the apple." Commonwealth's Brief at 5. Eligibility for parole consideration is "entirely a function of the sentence." *Id*. (emphasis omitted). The Commonwealth points out that many individuals, including the lead plaintiff in this case, have attempted to file PCRA petitions seeking a declaration that their sentences are unconstitutional following *Miller* but have uniformly lost. "They cannot simply repackage those failed sentencing claims as 'administrative' challenges without obliterating the PCRA's jurisdictional boundaries while turning Commonwealth Court into just another post-conviction review forum." *Id*. The Commonwealth submits that *Hudson* supports its position because that case "held that § 1102(b)—by its own terms—does indeed bar parole." *Id*. at 7. Therefore, LWOP "is not independent of the sentencing statute … but integral to it." *Id*.

Responding to the argument that the *Hudson* Court implicitly determined that the Commonwealth Court has jurisdiction over all types of parole eligibility claims, the Commonwealth points out that "the parties … proceeded without objection" as to jurisdiction, and "this Court was not obligated to object on their behalf, and its restraint does not create legal precedent." *Id.* at 11.

The Commonwealth also says that Appellants' reliance on extending cases like *Miller* illustrates that Appellants do not merely challenge parole as a "condition." "Petitioners are at a loss to explain why an effort to *apply Miller* belongs in a PCRA court, but an effort to *extend Miller* belongs in Commonwealth Court." *Id.* at 11-12. The Commonwealth maintains that the Appellants will become eligible for parole only if a new decision determines that LWOP is an unconstitutional sentence for persons convicted of felony murder and is held to apply retroactively through the PCRA. *Id.* at 18.

### III.

### Analysis

"In ruling on whether the preliminary objections … were properly sustained, we must determine whether it is clear and free from doubt from all the facts pleaded that Appellants will be unable to prove facts legally sufficient to establish jurisdiction or a right to relief." *Ciamaichelo v. Indep. Blue Cross*, 909 A.2d 1211, 1216 n.7 (Pa. 2006) (citation omitted). "The issue for review centers on the question of subject matter jurisdiction. As this question is purely one of law, our standard of review is de novo, and our scope of review is plenary." *Commonwealth v. Jones*, 929 A.2d 205, 211 (Pa. 2007) (quoting *Commonwealth v. Bethea*, 828 A.2d 1066, 1071 n.5 (Pa. 2003)). Additionally, the jurisdictional question involves an interpretation of Section 761(a)(1) and (a)(1)(i), and we

thus must examine the statutory text. "Whether subject matter jurisdiction lies in the Commonwealth Court is a question of statutory interpretation, as to which our standard of review is *de novo* and our scope of review is plenary." *In re Petition for Enf't of Subpoenas issued by Hearing Exam'r in a Proceeding before Bd. of Med.*, 214 A.3d 660, 666 (Pa. 2019) (citation omitted). As with all questions of statutory interpretation, "our foremost object is to 'ascertain and effectuate the intention of the General Assembly.'" *Id.* (quoting 1 Pa.C.S. § 1921(a)). Thus, our task is to determine whether this petition contains claims that the General Assembly would have intended the Commonwealth Court to hear.

On its face, the petition for review sought relief against the Board and therefore meets the plain language of Section 761(a)(1). The Commonwealth responds that the claim Appellants have raised is in the nature of a writ of habeas corpus and therefore falls within the plain language of (a)(1)(i). At this juncture, a discussion of jurisdictional concepts and the General Assembly's creation of a separate forum for processing collateral claims concerning an inmate's sentence provides useful background for our analysis.

## A.

### Jurisdiction

Article V, Section 4 of the Pennsylvania Constitution, adopted April 23, 1968, created the Commonwealth Court and stated that the court shall "have such jurisdiction as shall be provided by law." The General Assembly enacted Section 761 of the Judicial Code, which conferred the Commonwealth Court with original and exclusive jurisdiction over certain cases, including civil actions or proceedings against government agencies

and officials. The conferral of original and exclusive jurisdiction creates subject-matter jurisdiction in the Commonwealth Court for the specified classes of claims. *See Shenango Valley Osteopathic Hosp. v. Dep't of Health*, 451 A.2d 434, 437 n.7 (Pa. 1982) ("Certainly a complaint alleging a cause of action for relief against the Commonwealth derivative from provisions of the federal and state constitutions states a claim within the subject-matter jurisdiction of the Commonwealth Court."). Simultaneously, the statutory exclusion cited by the Commonwealth makes clear that any claim that is "in the nature of applications for a writ of habeas corpus or post-conviction relief" is removed from the Commonwealth Court's original jurisdiction.

The General Assembly has separately created a statutory mechanism for adjudicating "a writ of habeas corpus or post-conviction relief." The Post-Conviction Relief Act "shall be the sole means of obtaining collateral relief and encompasses all other common law and statutory remedies for the same purpose that exist when this subchapter takes effect, including habeas corpus and coram nobis." 42 Pa.C.S. § 9542.[5] That the PCRA exists at all is a matter of statutory grace as "States have no constitutional obligation to provide a means for collaterally attacking convictions; however, if they do, then such procedures must comport with the fundamental fairness mandated by the Due Process Clause." *Commonwealth v. Haag*, 809 A.2d 271, 283 (Pa. 2002) (citation omitted). *See also Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987) ("Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It

---

[5] "[W]e have never held that the remedy of *habeas corpus* does not exist for the rare instance where the PCRA offers no remedy." *Commonwealth v. West*, 938 A.2d 1034, 1043 (Pa. 2007). There is no question that the PCRA offers a remedy if the claim is viewed as challenging the constitutionality of a sentence of LWOP.

is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature.").

The General Assembly's determination that a PCRA petition must be filed within one year of when a petitioner's judgment of sentence becomes final[6] is statutorily described as a jurisdictional limitation. 42 Pa.C.S. § 9545 (entitled "Jurisdiction and proceedings"); *see also Commonwealth v. Peterkin*, 722 A.2d 638, 641 (Pa. 1998) ("[O]n November 17, 1995, the General Assembly amended the PCRA to require that, as a matter of jurisdiction, a PCRA petition must be filed within one year of final judgment."). We have further concluded that this jurisdictional requirement implicates subject-matter jurisdiction. *Commonwealth v. Fahy*, 737 A.2d 214, 222 (Pa. 1999) ("Jurisdictional time limits go to a court's right or competency to adjudicate a controversy."); *Commonwealth v. Whitney*, 817 A.2d 473, 478 (Pa. 2003), *overruled on other grounds by Commonwealth v. Small*, 238 A.3d 1267 (Pa. 2020) ("We have also held that even where the PCRA court does not address the applicability of the PCRA timing mandate, this Court will consider the issue *sua sponte*, as it is a threshold question implicating our subject matter jurisdiction and ability to grant the requested relief."). The PCRA's strict one-year limit on filing a petition reflects the General Assembly's intent to accord finality to the criminal process. *See Peterkin*, 722 A.2d at 642 ("With the 1995 amendments to the PCRA, the

---

[6] A judgment of sentence becomes final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S. § 9545(b)(3). The finality line is critical because defendants whose cases are not yet final are constitutionally entitled to the retroactive application of new rules subject to doctrines like waiver. *Griffith v. Kentucky*, 479 U.S. 314 (1987); *Commonwealth v. Hays*, 218 A.3d 1260 (Pa. 2019) (declining to apply on direct review a new rule due to defendant's failure to preserve the issue).

General Assembly has established a scheme in which PCRA petitions are to be accorded finality. … At some point litigation must come to an end.").

Relatedly, the PCRA offers a limited ability to obtain relief based on subsequent changes in the law issued after the one-year period to seek collateral relief has lapsed. The PCRA contains three statutory exceptions to the time-bar, including, as relevant here, for the assertion of "a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively." 42 Pa.C.S. § 9545(b)(1)(iii). This exception balances the societal interest in affording criminal convictions finality against the societal interest in permitting defendants to obtain relief based on extraordinary changes in the law.

**B.**

***Hudson* and jurisdiction**

The Section 9545(b)(1)(iii) exception has been frequently invoked as a basis to apply Eighth Amendment cases like *Miller* or extend them to defendants similarly situated to Appellants. *See Commonwealth v Cintora*, 69 A.3d 759, 764 (Pa. Super. 2013) (holding that the exception does not recognize "a new Eighth Amendment right, that those whose brains were not fully developed at the time of their crimes are free from mandatory life without parole sentences"); *Commonwealth v. Lee*, 206 A.3d 1, 10 (Pa. Super. 2019) (en banc) ("As compelling as the 'rationale' argument is, we find it untenable to extend *Miller* to one who is over the age of 18 at the time of his or her offense for purposes of satisfying the newly-recognized constitutional right exception in section 9545(b)(1)(iii)."). Setting aside for the moment that these cases involved claims explicitly

seeking relief from unconstitutional punishment, the Commonwealth's argument that Appellants' position undermines this body of case law is compelling. Yet, as Appellants point out, *Hudson* implicitly accepted that claims challenging parole eligibility are properly within the Commonwealth Court's original and exclusive jurisdiction. We thus begin with this purported discrepancy.

Initially, we reject the Commonwealth's response that *Hudson* may be ignored because the parties did not raise any jurisdictional issue. The General Assembly conferred the Commonwealth Court with subject-matter jurisdiction over certain matters, and "subject-matter delineations must be policed by the courts on their own initiative even at the highest level." *Bisher v. Lehigh Valley Health Network, Inc.*, 265 A.3d 383, 400 (Pa. 2021) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). To the extent the debate in this case is simply about **which** court is tasked with adjudicating the present dispute (as opposed to whether any court can hear the matter), the institutional interest is somewhat lessened because the General Assembly has authorized this case to proceed either in the Commonwealth Court or in the relevant courts of common pleas through the PCRA.[7] Nevertheless, this Court could not implicitly sanction the

---

[7] We distinguish *Stackhouse* on the basis that the parties and this Court agreed that at least one of the counts belonged in the Commonwealth Court. Moreover, the three-Justice plurality opinion is not binding, and the three dissenting Justices disagreed with recharacterizing the complaint. The dissenting Justices opined that the proper course was to have the monetary damages counts proceed in the courts of common pleas, with the Commonwealth Court having appellate jurisdiction over those claims once resolved by the court of common pleas. The controlling vote was cast by Justice Newman, who opined that the key question was whether the Commonwealth Court, by virtue of having exclusive original jurisdiction over count one, had ancillary jurisdiction over the remaining two claims as set forth by Section 761(c). Justice Newman concluded that because "the General Assembly has expressly removed this variety of claim from the possible

Commonwealth Court adjudicating a case that the General Assembly removed from its jurisdiction.

In retrospect, a discussion of jurisdiction in *Hudson* would have been useful, and we rectify that omission today. We conclude that when examining the plain language of Section 761 the Commonwealth Court properly addressed the dispute in *Hudson* as a matter within its original jurisdiction. The *Hudson* petitioner, like the Appellants here, was serving a LWOP sentence and was denied parole. Hudson then filed a petition for review in the Commonwealth Court's original jurisdiction, asking the court to direct the Board to review him for parole. The Commonwealth Court sustained a demurrer on the grounds that the Board cannot grant parole to an inmate serving a life sentence. Because Hudson, like Appellants here, requested that the Board process his parole application, the case facially supports the Appellants.

A closer examination, however, reveals that the instant petition and the *Hudson* claims are only superficially similar. As discussed later in full detail, the primary distinction is that Hudson's request for relief required only a determination of whether his sentence included an implied minimum of one day, whereas Appellants here seek a determination that their sentence is illegal. The former type of claim need not be brought under the PCRA whereas the latter must due to the fact each appellant's sentence became final long ago.

---

cognizance of the Commonwealth Court in the exercise of its original jurisdiction, ancillary jurisdiction over this matter cannot lie." *Stackhouse*, 832 A.2d at 1010 (Newman, J., concurring). This case involves no comparable questions of ancillary jurisdiction as the parties agree that the suit must proceed en toto in either the Commonwealth Court or under the PCRA.

As this is a matter of statutory interpretation, we return to the text. Section 761(a)(1)(i) states that the Commonwealth Court lacks subject-matter jurisdiction over claims that constitute "actions or proceedings in the nature of applications for a writ of habeas corpus or post-conviction relief not ancillary to proceedings within the appellate jurisdiction of the court." 42 Pa.C.S. § 761(a)(1)(i). The language "in the nature of" signals that a court is not cabined by the most generic categorization of the requested relief. Doing so would risk contradicting legislative intent, as creative plaintiffs can mask the nature of a claim through artful pleading. We have recognized that the captioning of a pleading does not control. In *Commonwealth v. Porter*, 35 A.3d 4, 12 (Pa. 2012), we stated: "Misdesignation does not preclude a court from deducing the proper nature of a pleading." (citing *Commonwealth v. Abdul-Salaam,* 996 A.2d 482 (Pa. 2010)). In *Abdul-Salaam*, we stated, "[n]otwithstanding the exclusivity of the PCRA for such collateral attacks, appellant styled the petition as a 'Third *Protective* Petition for Habeas Corpus Relief.'" *Id.* at 483-84. We quashed the appeal as interlocutory and indicated that "the court should decide the serial PCRA petition—styled by appellant as his 'Third Protective Petition.'" These cases indicate that a court should examine the arguments and the requested relief to discern the true "nature" of the claim.

Thus, *Hudson* cannot be reduced to the proposition that a claim implicating "parole eligibility" is automatically included (or excluded) from the Commonwealth Court's original jurisdiction. We believe that the starting point for determining the "nature" of a given claim requires an examination of what effect the requested relief would have in light of the legal theories offered in support. In short, if the necessary consequence of granting relief based on the supplied arguments is that the conviction or sentence is undone or otherwise

modified, then the claim is in the "nature of … a writ of habeas corpus or post-conviction relief[.]"

Applying this framework to *Hudson* the claims in that case were **not** in the nature of a writ of habeas corpus or post-conviction relief. Had Hudson's legal theory prevailed, both his conviction and sentence would remain wholly unchanged. Hudson asserted that he was eligible for parole because he had reached his minimum sentence of one day. Because life sentences do not include any minimum, Hudson argued that "he should be presumed to have a minimum sentence of one day and, as such, that he should immediately be reviewed for parole." *Id.* Hudson pointed out that 42 Pa.C.S. § 9756, which applies to sentences of total confinement, states that a court "may impose a sentence to imprisonment without the right to parole" in specified situations, life imprisonment not among them. 204 A.3d at 398 (quoting 42 Pa.C.S. § 9756(c)). We agreed that the language was "admittedly somewhat confounding, as it does seem to imply that, in every other instance besides the four categories mentioned … a sentencing court may not impose a sentence which omits a parole-eligibility date." *Id.* Yet "the sole statutory directive for courts in imposing a minimum term of total confinement does not apply to mandatory life sentences." *Id.* As a result, trial courts were "unable to specify a parole-availability date in accordance with law, and unable to omit one in accordance with law." *Id.* We concluded that Hudson "lack[ed] any legal right to parole eligibility" and that no implied minimum sentence existed. *Id.* at 399.

But Hudson would have been eligible for parole if his sentence did include an implied minimum. More significantly, had we agreed that a minimum sentence was imposed by operation of law, Hudson's sentence would not have been modified in any

way. Thus, the predicate condition for merits relief did not involve any disruption of the underlying sentence. It merely required a judicial determination of whether the sentence included a presumed minimum. This puts *Hudson* on the same footing with other cases that we have determined may proceed outside the PCRA. For example, in *Commonwealth v. Martinez*, 147 A.3d 517 (Pa. 2016), we examined three appeals, where each plaintiff sought lesser sexual registration obligations based on a theory of specific performance of their plea agreements.[8] Our *Martinez* decision concluded that "a court must determine whether an alleged term is part of the parties' plea agreement. If the answer to that inquiry is affirmative, then the convicted criminal is entitled to specific performance of the term." *Id.* at 533. Determining whether an alleged term is part of an agreement is analogous to the *Hudson* Court's determination of whether Hudson's sentence contained a presumed minimum.

Further supporting this understanding of *Hudson* is our order in *Brown v. Pennsylvania Department of Corrections*, 81 A.3d 814 (Pa. 2013) (per curiam), wherein we vacated a Commonwealth Court order and remanded with instructions to transfer to the court of common pleas. Petitioner David Brown filed a petition for review "alleging that his confinement … was illegal due to an alleged failure of SCI–Albion to produce a written sentencing order[.]" *Id.* The Commonwealth Court dismissed for lack of jurisdiction. While we declined to address the merits of the claim, our decision confirmed the Commonwealth Court's determination that per Section 761(a)(1)(i) the action did not belong in the Commonwealth Court. Instead, the action belonged "in the jurisdiction and

---

[8] While the *Martinez* decision did not discuss the PCRA, our subsequent decision in *Commonwealth v. Lacombe*, 234 A.3d 602, 617 (Pa. 2020), parenthetically noted that the petitions would have been untimely under the PCRA.

venue of the court of record from which the order of detention came." *Id.* at 815. This was because Brown "initially and principally is testing 'the legality of [his] commitment and detention,' and therefore his petition for review sounded in *habeas corpus.*" *Id.* (quoting *Commonwealth ex rel. Bryant v. Hendrick,* 280 A.2d 110, 112 (Pa. 1971)) (bracketing in original). *Brown* did not specify whether the claim was to ultimately be treated as a PCRA petition once transferred to the court of common pleas or whether it was the type of claim for which the PCRA offered no remedy. *See Commonwealth v. Judge*, 916 A.2d 511, 520 (Pa. 2007) (permitting petition for writ of habeas corpus to proceed outside the PCRA) ("Appellant's claim concerning his deportation from Canada to face a death sentence falls outside the intended scope of the PCRA."). But the core logic underpinning *Brown*, that if a claim is testing the legality of commitment it is in the nature of habeas corpus and thus is not within the Commonwealth Court's original jurisdiction, is sound.

### C.

### These claims test the legality of continued confinement

Having determined that the *Hudson* claims were not "in the nature of … a writ of habeas corpus" and thus properly before the Commonwealth Court, the question remains whether the same is true of these claims. As with *Hudson*, we make this determination by examining the legal theories offered in support and assessing the consequences of granting relief.

Beginning with their legal theories, Appellants forward a creative argument by attempting to divorce parole eligibility from the criminal sentence. But this purported distinction breaks down when scrutinized. First, *Hudson* holds otherwise. We explained that the "minimum sentence merely sets the time after which he is eligible to serve the

remainder of his sentence on parole." *Hudson*, 204 A.3d at 396. Our opinion concluded that the General Assembly did not intend for a trial judge to impose a minimum sentence when imposing a sentence of life imprisonment. Furthermore, a minimum sentence could not be presumed. *Id.* at 398-99. This represents a holding that the General Assembly intended that for all offenders who are sentenced to life imprisonment, ineligibility for parole is a part of their sentence. Nor is that outcome surprising as this Court had already addressed, albeit in cursory fashion, a similar claim. *See Commonwealth v. Cornish*, 370 A.2d 291, 293 (Pa. 1977) ("[T]o the extent Cornish's argument can be understood as challenging the legality of [Section] 1102(b) … because it disallows judicial discretion in sentencing by providing for a mandatory sentence of life imprisonment in all cases of murder of the second degree, the contention is devoid of merit.").

The Dissent states that we "somehow conclude[ ] that Appellants' judgments of sentence prohibit parole, which is not what the Crimes Code says." Dissenting Op. at 4 (Wecht, J.). The Dissent does not cite authority establishing that the judgment of sentence is defined solely by the punitive measures specified within the Crimes Code, and we fail to see why the challenged provision in the Parole Code is not fairly described as part of the criminal sentence. *Cf. Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 658 (1974) (holding that a section of a repealed statute which had barred parole eligibility for certain narcotics offenders survived the repeal; "Although, of course, the precise time at which the offender becomes eligible for parole is not part of the sentence … it is implicit in the terms of the sentence."). Certainly, a flat categorical prohibition on parole that applied the moment Appellants were sentenced to the specified term of life imprisonment constitutes a punitive measure. *Id.* at 662 ("[O]nly an unusual prisoner

could be expected to think that he was not suffering a penalty when he was denied eligibility for parole."). And if the General Assembly attempted to categorically bar parole eligibility after-the-fact for a set of crimes, that increased punishment would raise serious constitutional questions. *See Cimaszewski v. Bd. of Prob. & Parole*, 868 A.2d 416, 426–27 (Pa. 2005) ("[I]t is now clear that retroactive changes in the laws governing parole *may* violate the ex post facto clause. … The controlling inquiry in determining if an ex post facto violation has occurred is whether retroactive application of the change in the law creates a significant risk of prolonging Appellant's incarceration.") (quotation marks, citation, and bracketing omitted). As a result, the legislative intent to forever bar parole eligibility for all individuals convicted of second-degree murder is best described as part of the judgment of sentence.[9] That explains, of course, why so many litigants

---

[9] The Dissent claims that we hold that "provisions of the Parole Code that govern the powers of the Parole Board are somehow 'best described as part of the judgement of sentence.'" Dissenting Op. at 5 (Wecht, J.). We merely observe that, when the General Assembly bars parole eligibility for a crime, that punitive measure is part of the judgment of the sentence.

To the extent the Dissent reads our analysis as universally addressing all crimes, that incorrectly conflates a legislative judgment that certain offenders may never seek parole with offenders who the General Assembly say may become eligible for parole. In the former case, the General Assembly's clear intent to categorically bar parole eligibility serves to impose a mandatory minimum of life imprisonment without the possibility of parole. In the latter cases, a prisoner becomes eligible for parole upon serving the minimum sentence specified, even though the prisoner may or may not be granted parole at that time. Thus, the observation that parole does not set aside or affect the sentence, *id.* at 8 n.27, is inapt. The cited case speaks to "prisoners who seem capable of rehabilitation outside of prison walls," *id.*, but that point has no bearing where the General Assembly had already decided that Appellants should forever remain behind those walls. *See id.* at 3 n.8 (conceding that the General Assembly "intended to ensure that those convicted of second-degree murder are never to be released on parole."). The Dissent's insistence that the judgment of sentence does not prohibit parole is incompatible with that legislative intent. Absent evolving Eighth Amendment cases regarding the

seek relief via the PCRA when a new Eighth Amendment case is decided: the claim is that their sentence is now (based on the change in law) illegal. *See* 42 Pa.C.S. § 9542 ("This subchapter provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief.").

Nor is it a new notion that the ineligibility for parole when paired with the specified sentence of life imprisonment operates to impose a mandatory minimum sentence of life imprisonment without the possibility of parole. Indeed, in *Commonwealth v. Cunningham*, 81 A.3d 1 (Pa. 2013), which addressed whether *Miller* would apply retroactively, we acknowledged that "the *Miller* majority did not specifically address the question of whether its holding applies to **judgments of sentence** for prisoners, such as Appellant, which already were final as of the time of the *Miller* decision." 81 A.3d at 4 (emphasis added). As then-Chief Justice Castille recognized, the General Assembly had created a mandatory sentence of life imprisonment without parole. "Prior to *Miller,* there was nothing … to restrict the legislative power to establish a mandatory sentence of life imprisonment without possibility of parole … as appropriate punishment for a juvenile who commits murder of the first or second degree." *Id.* at 11 (Castille, C.J, concurring).

Furthermore, accepting Appellants' description of their parole eligibility as a mere "condition" with respect to their convictions and yet part of the sentence for other convictions, including other types of felony murder, would lead to absurd results. For example, a defendant who commits second-degree murder by means of arson "shall be sentenced to life imprisonment without right to parole." 18 Pa.C.S. § 3301(b)(1). The

constitutionality of criminal sentences, these Appellants would have no basis whatsoever to challenge their inability to seek parole.

inability to receive parole under this statute satisfies the Dissent's Crimes Code-based test and thus an individual convicted of that crime could not seek relief in the Commonwealth Court under the Appellants' theory. This is an absurd result,[10] which *Hudson* rightly eschews by treating all individuals serving a sentence of life imprisonment as ineligible for parole regardless of the statutory language contained within the underlying crime or other sentencing statutes.[11,12] In all cases where a trial court is required to impose a sentence of life imprisonment, the inability to set a minimum period

---

[10] And perhaps an unconstitutional one, as there would seem to be no valid basis to permit one set of individuals to challenge their parole ineligibility while denying the same to others even though the General Assembly intended for all to be ineligible for parole.

The Dissent forces its views of the legal issues upon our opinion, claiming that this observation suggests that the General Assembly could not impose different punishments for different crimes. Dissenting Op. at 5 n.14 (Wecht, J.). The General Assembly can of course dictate different punishments for different crimes. The potential infirmity arises from the fact that we conclude that the General Assembly intended for sentences of life imprisonment to include, as part of the criminal sentence, a total inability to receive parole.

[11] The statutes enacted following *Miller* are the exception to this. 18 Pa.C.S. § 1102.1.

[12] The Dissent claims that this is a "startling admission indeed, and not one that we often encounter in a judicial opinion." Dissenting Op. at 5 (Wecht, J.). The "startling" nature of our observation comes only from the Dissent grafting onto our opinion its view that a judgment of sentence is solely defined by the punishment specified within the Crimes Code—a position that we reject. To be clear, we do not blithely ignore statutory language. Instead, we merely hold that regardless of whether the General Assembly chose to explicitly insert the words "without parole" within the Crimes Code the various statutory provisions, working together, operate as a matter of law to impose a sentence of life imprisonment without the possibility of parole. The Dissent does not say what else a categorical bar on parole eligibility would possibly be if not a punitive sanction flowing from the criminal conviction (i.e., a sentence), nor does it explain how Eighth Amendment cases have any bearing on the legal issue presented if Appellants are not in fact attacking their criminal sentences.

of incarceration means that by operation of law the offender is serving a mandatory sentence of life imprisonment without parole.

Second, the case law that Appellants rely upon to support the merits of their claim all involve the constitutionality of criminal sentences. Appellants' papers are replete with references to United States Supreme Court case law describing the Eighth Amendment's proportionality component. The Eighth Amendment prohibits "cruel and unusual punishments," and, for the most part, decisions interpreting the Eighth Amendment "consider punishments challenged not as inherently barbaric but as disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 59 (2010). The proportionality concept is rooted in the concept that "punishment for crime should be graduated and proportioned to offense." *Weems v. United States*, 217 U.S. 349, 367 (1910).

Proportionality challenges "fall within two general classifications." *Graham*, 560 U.S. at 59. The first type is challenges to a sentence's length given all the circumstances of a case. *Id.* The second involves categorical challenges, i.e., a particular penalty is barred in some circumstances. Prior to *Graham*, categorical challenges involved only the death penalty, and those analyses further broke down into (1) whether the conduct warranted the death penalty; *See, e.g.*, *Enmund v. Florida*, 458 U.S. 782 (1982) (holding that death penalty is categorically prohibited for juveniles who commit nonhomicide offenses); *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (holding that death penalty is unconstitutionally excessive penalty for crimes against individual persons where death did not occur; striking down statute authorizing death penalty for rape of a child under twelve), or (2) whether some characteristic inherent to the class of offender renders them ineligible for the death penalty; *See, e.g.*, *Ford v. Wainwright*, 477 U.S. 399 (1986)

(barring capital punishment upon insane prisoners); *Atkins v. Virginia,* 536 U.S. 304 (2002) (barring death penalty for intellectually disabled individuals); *Roper v. Simmons,* 543 U.S. 551 (2005) (barring death penalty for offenders who committed homicide as juvenile). *Graham* marked the first time that the court considered a categorical challenge to a term-of-years sentence; the high Court held that a juvenile cannot be sentenced to LWOP for a nonhomicide offense. *See Miller*, 567 U.S. 460 (holding that mandatory sentence of LWOP for juvenile homicide offender is unconstitutional)*; Jones v. Mississippi*, __ U.S. __, 141 S. Ct. 1307, 1315 (2021) (holding that "permanent incorrigibility is not an eligibility criterion akin to sanity or a lack of intellectual disability," and thus no separate factual finding is required before sentencing juvenile homicide offender to LWOP).

Appellants wish to extend this case law to mandatory LWOP sentences. Appellants' Brief at 8 ("Appellants seek an analogous application of the longstanding jurisprudence designating those who did not take a life or intend to take a life as having categorically diminished culpability to Pennsylvania's complete prohibition on any meaningful opportunity for release from prison."). In terms of these precedents, Appellants lodge a categorical challenge to a term-of-years sentence.[13] *Id*. at 35 (maintaining that Section 6137(a)(1) is unconstitutional "as applied to Appellants due to their categorically-diminished culpability because they did not take a life or intend to take

---

[13] We need not go into detail on the merits of their claims, but at various times the petition for review alluded to an as-applied challenge instead of a categorical. *See Graham*, 560 U.S. at 91-94 (Roberts, C.J., concurring) (rejecting categorical ban on LWOP for nonhomicide offender but concluding that, under the circumstances of the particular case, the sentence was grossly disproportionate).

a life[.]"). As *Graham* recognized, an assertion that "a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes" is unconstitutional attacks the "sentencing practice itself[.]" *Id.* at 61. Indeed, these Eighth Amendment precedents are simply irrelevant **unless** Appellants are challenging the "sentencing practice" scheme in Pennsylvania that results in their ineligibility for parole. In *Montgomery v. Louisiana*, 577 U.S. 190, 201 (2016), the United States Supreme Court held that States must give retroactive effect to *Miller* because the case "eliminated [the] State's power to … impose a given punishment." Appellants seek to build on these cases by eliminating the Commonwealth's ability to impose their punishment, i.e., they challenge the legality of their sentence. As *Hudson* made clear, "in view of the mandatory nature of the life sentence associated with his offense, [the trial court] was required to sentence Appellant to life without parole." *Hudson*, 204 A.3d at 399. This is a "sentencing practice" that yields a mandatory LWOP sentence, which renders the Appellants categorically ineligible for parole. Appellants are free to challenge the constitutionality of that sentencing practice, but at the end of the day the arguments supporting the instant petition for relief principally test the legality of Appellants' continuing confinement in light of evolving Eighth Amendment law.

The *Miller* Court readily understood that our Crimes Code and Parole Code work in tandem to supply a sentence of life imprisonment without parole, with parole ineligibility a part of the sentence itself. "Of the [twenty-nine] jurisdictions mandating life without parole for children, more than half do so by virtue of generally applicable penalty provisions, imposing the sentence without regard to age." *Miller*, 567 U.S. at 486. In the accompanying footnote, the Court listed Pennsylvania as one of those jurisdictions, citing

18 Pa. C.S. §§ 1102(a), (b), and 61 Pa. C.S. § 6137(a)(1). *Id.* at n.13. These "generally applicable penalty provisions" plainly result in a mandatory sentence of not just life imprisonment, but of life imprisonment without parole and reflect a legislative determination that offenders who receive a life sentence may never be released through the Board's parole process. Indeed, the United States Supreme Court used the term "sentencing scheme" as opposed to "a sentence of life in prison without parole," recognizing that many jurisdictions, including this Commonwealth, impose the punitive measure of forever barring parole eligibility through statutes that jointly operate to ensure an offender is ineligible for release. *Id.* at 479 ("We therefore hold that the Eighth Amendment **forbids a sentencing scheme** that mandates life in prison without possibility of parole for juvenile offenders.") (emphasis added). The term "scheme" captures the fundamental point that "mandatory sentencing schemes … by definition remove a judge's or jury's discretion." *Id.* at 483 n.10. Obviously, the same is true here. The trial judge was barred from imposing anything other than life imprisonment, and, in turn, the Parole Code ensures that these offenders are ineligible for parole. Our "sentencing scheme" therefore results in a sentence of life imprisonment without parole, not simply life imprisonment.[14] We thus find Appellants' argument that their ineligibility of parole is not part of the "true" sentence to be unavailing.

---

[14] This is not a novel concept. For example, in Michigan, pre-*Miller* adult offenders were treated no differently than juveniles whose cases were adjudicated in the adult courts. "Because an adult convicted of first-degree murder 'shall be punished by imprisonment for life,' MCL 750.316(1), and is not eligible for parole, MCL 791.234(6)(a), defendants were ultimately sentenced to terms of life without parole." *People v. Carp*, 852 N.W.2d 801, 812 (Mi. 2014). Thus, even though the Michigan statute specified only a sentence of "life imprisonment," the court acknowledged that the actual sentence was life without parole. As stated by the Supreme Court of Louisiana:

**D.**

**Analogous federal law**

Our analysis tracks the federal cases relied upon by Appellants, which deal with the interaction of 42 U.S. § 1983 and the federal habeas corpus statute. Both statutes "provide access to a federal forum for claims of unconstitutional treatment at the hands of state officials, but they differ in their scope and operation." *Heck v. Humphrey*, 512 U.S. 477, 480 (1994). As relevant here, a "potential overlap" occurs when a state prisoner files a Section 1983 claim but "challenges the fact or duration of his confinement and seeks immediate or speedier release[.]" *Id.* at 481. These claims "may come within the literal terms of [Section] 1983" by asserting a deprivation of constitutional rights but may nonetheless be barred due to the overlap with the habeas statute. *Heck* was an example of a suit barred due to that overlap. Heck, serving a prison sentence based on a conviction for voluntary manslaughter, filed a Section 1983 claim seeking monetary damages from prosecutors and a police investigator, alleging that the officials committed various constitutional violations during the prosecution of his case, including knowingly destroying exculpatory evidence. Heck argued that the claim could proceed under Section 1983 because he did not seek release from custody. Heck had relied on *Preiser*

---

> In a similar situation, this Court noted that since Section 15:574.4(B) provides unequivocally that no inmate serving a life sentence shall be eligible for parole, parole consideration would be withheld from the defendant, by operation of law, despite the fact that the applicable penalty provision did not include the words "without benefit of parole."

*Bosworth v. Whitley*, 627 So. 2d 629, 635 (La. 1993). The same is true here: by operation of law parole was withheld from these Appellants, and any challenge to that statutory bar necessarily seeks to challenge the legality of their continued confinement.

*v. Rodriguez*, 411 U.S. 475 (1973), which stated in dictum that a Section 1983 suit could proceed if only monetary damages are at issue. The *Heck* Court disavowed that theory. "That statement may not be true, however, when establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction." *Heck*, 512 U.S. at 481-82. If so, the plaintiff is attacking the fact or length of confinement and the claim must follow the habeas corpus procedures.

That follows our analysis today. As in *Heck*, Appellants' petition for relief does not explicitly seek immediate release from custody nor a declaration that their sentences are unconstitutional. But the inevitable consequence of extending the Eighth Amendment case law to Appellants would result in a holding that their mandatory sentences of life imprisonment without parole are unconstitutional. The same was true in *Heck*. Even though the litigant did not directly challenge the conviction, the *Heck* Court recognized that a successful Section 1983 claim for damages would have that effect.

> [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id.* at 487 (footnote omitted).

Requiring courts to "consider whether a judgment in favor … would necessarily imply the invalidity of his conviction or sentence" requires a court to consider the result in light of the arguments presented. In fact, the case that Appellants rely on proves the point. In *Hill*, the United States Court of Appeals for the Sixth Circuit addressed various

claims stemming from a suit filed in 2010 by numerous juvenile offenders which correctly anticipated the outcomes in *Miller* and *Montgomery*. The litigants raised several claims, including, as pertinent here, a categorical claim that juvenile offenders can never be sentenced to LWOP for homicide offenses, and a separate claim that the available "policies and procedures" for parole were constitutionally defective. The former count was barred by the holding in *Heck*, while the latter was not. The former "functionally asks us to declare sentences of life without parole for juvenile offenders unconstitutional. Such a ruling would necessarily implicate the duration of Plaintiffs' impending sentences by imposing a ceiling, and *Heck* therefore requires Plaintiffs to follow a different legal path to obtain the relief." *Hill*, 878 F.3d at 208-09. The latter claim, however, could proceed under Section 1983.

Appellants quote the disposition of the latter claim but ignore the first. The flaw in that selectivity is that the latter claim could proceed only because of *Montgomery*'s holding that *Miller* was a substantive rule that must be given retroactive effect by the States. *Montgomery*, 577 U.S. at 201 ("Substantive rules … place certain criminal laws and punishments altogether beyond the State's power to impose. It follows that when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful."). Thus, a substantive rule has "the **automatic consequence** of invalidating a defendant's conviction or sentence." *Id.* (emphasis added). Indeed, the *Hill* Court's discussion of this count approvingly cited a case that involved a prisoner who "had been convicted of possession of more than 650 grams of cocaine and was made technically eligible for parole when the Michigan Supreme Court eliminated a parole limitation for possession offenses[.]" *Hill*, 878 F.3d at

209. Thus, those claims could proceed under Section 1983 only because the criminal sentence had already been invalidated. *Heck*, 512 U.S. at 487 (stating that "the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated"). There is no case holding that Appellants' sentences are automatically invalidated. Appellants seek to have the Commonwealth Court issue that holding. The General Assembly, however, deprived the Commonwealth Court of the needed subject-matter jurisdiction to do that since the PCRA is the only venue available for these litigants.[15]

---

[15] The Dissent fears that "future legislative reforms will now be hamstrung" by our holding that the ineligibility of parole is deemed part of the judgment of sentence. Dissenting Op. at 13 (Wecht, J.). Our holding recognizes that the General Assembly was empowered to set the punishment for second degree murder as life imprisonment without the possibility of parole, and that the PCRA reflects its judgment that the timeframe for seeking collateral relief from those sentences was deliberately curtailed.

Nothing we say today addresses the General Assembly's "ability to expand parole eligibility to lifers with a simple change to the Parole Code." *Id.* at 14. We acknowledge that in *Commonwealth v. Sutley*, 378 A.2d 780 (Pa. 1977), this Court addressed a statute permitting offenders who were convicted under a harsher statute the right to be resentenced under a more lenient amended statute. The *Sutley* Court held that the statute was unconstitutional by violating the separation of powers. Again, these issues go far beyond the limited issue presented here and we thus briefly note only that the *Sutley* decision has been criticized for its focus on the judiciary's authority. *See Villani v. Seibert*, 159 A.3d 478, 487 n.6 (Pa. 2017) ("We note that several Justices, as well as other judges and commentators, have expressed substantial discomfort with decisions, such as *Sutley*, which have evaluated legislative social policy judgements having broad-scale, substantive impacts mainly in terms of a concern for judicial power."). Moreover, the *Sutley* decision was largely concerned with the fact the judge had previously exercised judicial discretion. 378 A.2d at 786 ("The judicial discretion is the determination of the period of control over the person of the offender in view of the nature of the crime, the background of the defendant and the other pertinent considerations for such a decision."). Those concerns have no applicability where the General Assembly had completely removed that discretion in the first place by enacting a statutory scheme resulting in a mandatory minimum of life imprisonment without parole. In sum, whatever

**IV.**

**Conclusion**

If the Commonwealth Court credited the legal theories argued in support of the parole eligibility claims, it would necessarily invalidate the criminal punishment imposed by our "sentencing practices." Appellants' sentences can, of course, be challenged. Because each Appellant's sentence became final long ago, those challenges must proceed, as Appellants admit, under the PCRA. Appellants' Brief at 31 ("If Appellants are indeed attacking their sentences as the Commonwealth Court found, then their challenges must be brought under the PCRA.").[16] Accordingly, we affirm.[17]

---

the merits of these points and distinctions, this case does not involve legislative reforms to LWOP sentences.

[16] Judge Leadbetter's dissenting opinion observed that any PCRA petitions filed by these Appellants "have been time-barred for many years and when they were timely, the pled circumstances which now give rise to potential Eighth Amendment claims did not exist." *Scott*, 256 A.3d at 496 (Leadbetter, J., dissenting). The "potential Eighth Amendment claims" did exist, they were merely foreclosed, then and now, by precedent. The PCRA exists to provide finality to the criminal process and the General Assembly did not intend to permit an end-run around the time-bar through creative pleading.

[17] We decline to remand the case to the Commonwealth Court with directions to transfer the petitions to the relevant courts of common pleas, as set forth by the Judicial Code:

> If an appeal or other matter is taken to or brought in a court or magisterial district of this Commonwealth which does not have jurisdiction of the appeal or other matter, the court or magisterial district judge shall not quash such appeal or dismiss the matter, but shall transfer the record thereof to the proper tribunal of this Commonwealth[.]

42 Pa.C.S. § 5103. We believe that transfer is not warranted because Appellants concede that their petitions would be dismissed as untimely. As there is no possibility that the result would be any different, judicial economy dictates that we affirm the order.

Chief Justice Todd and Justice Dougherty join the opinion.

Justice Mundy files a concurring opinion.

Justice Wecht files a dissenting opinion.

The Late Chief Justice Baer did not participate in the decision of this matter.

Justice Brobson did not participate in the consideration or decision of this matter.